**W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Petitioner,**

v.

**LOCAL 875, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Respondent.**

**No. 63–C–258.**

United States District Court
E. D. New York.

March 27, 1963.

Joseph P. Hoey, U. S. Atty., E. D. New York, for petitioner; George V. O'Haire, Asst. U. S. Atty., and Louis Weiner, U. S. Dept. of Labor, of counsel.

Sanford E. Pollock, New York City, for respondent.

ROSLING, District Judge.

Motion by the Secretary of Labor that an order be made directing the giving of testimony by named officials of the respondent local and the production and delivery of certain documents is granted subject to the directions hereinafter recited.

In the course of an ex parte and currently continuing administrative investigation of the proceedings of the local conducted by the Secretary in claimed performance of his functions under the Labor-Management Reporting and Disclosure Act of 1959 (Act of September 14, 1959, 73 Stat. 519 et seq., 29 U.S.C. § 401 et seq., [LMRDA or "Act"]) the Secretary caused to be issued a subpoena addressed to the local requiring its appearance at the address of the Bureau of Labor-Management Reports of the Department of Labor (Bureau) on November 15th, 1962 before a designated officer of the Bureau "to testify." The matter in which the testimony was to be given was described in the subpoena as "involving a determination whether any person has violated or is about to violate

any provision of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. 401, et seq., except Title I or amendments made by the Act to other Statutes."[1]

The subpoena additionally required the local to produce at the specified time and place "[a]ll records for the period from March 1, 1959,[2] to the present date maintained by (the local) pertaining to payment of dues by members of said Local 875, such records to include but not be limited to, dues receipts book and individual membership dues record card."

The subpoena-subpoena duces tecum had been served on November 5th, 1962. On the date therein scheduled for responsive attendance, namely November 15, no witness appeared nor were any records produced. The following day, the 16th, James Amedeo, president of the local, was informed by a respresentative of the Secretary that documents described in the subpoena duces tecum "were necessary for the purpose of the investigation of the respondent's compliance with the provisions of the * * * Act." Mr. Amedeo, however, thereupon confirmed verbally what the circumstances already disclosed inferentially, that he would not comply.

The Secretary in his prayer for relief now names[3] James Amedeo, as such president, and Charles Abella, its office manager, as the persons to be examined, and asks that the production and delivery of the documents be "into the custody and control of the Secretary" or of an officer or representative he may designate, "for examination and retention during such reasonable length of time as may be necessary, not exceeding thirty days from the date of such production and delivery."

In limited opposition to the application the local files the affidavit of its attorney and, responsive to the Court's request upon the argument, it has submitted a sampling, photostatically reproduced, of ledger sheets, each constituting the dues record of an individual member of the local. The affidavit concedes sub silentio that the witnesses may be interrogated. It, moreover, affirmatively acknowledges that the Secretary has the right to examine the ledger cards and that he need not demonstrate the existence of reasonable cause to establish such entitlement provided his examination is limited to a period subsequent to the effective date of the Act. Nor even as to an antecedent period does the affiant contend that the Secretary lacks power, but in such case, however, exercise, it is contended,[4] depends upon a showing of cause. Noting that the subpoena duces tecum calls for the production of preenactment period records, the earliest of which date back only to March 1, 1959, the local's attorney signifies a readiness to comply notwithstanding the Secretary's failure, in respondent's view, to establish the requisite causal basis. As to records for a period prior to March 1, 1959, however, the local maintains it has, and, accordingly, asserts a technical right to refuse their production.[5]

1. Language quoted from subpoena is substantially that found in Title 29 U.S.C. subd. (a) of § 521 which confers investigative authority upon the Secretary.

2. § 521 was enacted September 14, 1959.

3. The subpoena fails to identify the persons to be interrogated.

4. Without citation of supporting authority by respondent.

5. Counsel for the local proposed upon the argument that his client be permitted to mask with tape affixed to the cards before they were turned over to the Secretary, such pre-March 1st, 1959 entries as were not under the Act required to be made available for the Secretary's examination. Petitioner rejected such proposal as a dilution of his right to inspect and study those later notations as to which his authority was unquestioned. Investigation of authenticity of the subsequent entries, he pointed out, by appropriate methods including, possibly, laboratory tests, might be impeded or rendered nugatory if the original appearance of the cards was in any fashion modified. The Court's own inspection of the sample ledger sheets (see supra p. 4) discloses that the first items on these cards were entered no earlier than 1958. It is not clear to the Court, absent a lack of orthodoxy in bookkeeping procedures,

As thus far animadverted upon, the objections interposed by the respondent to the honoring of the Secretary's process would appear, and are found by the Court to be insubstantial, obstructionist and dilatory. It is only when respondent leaves off its reliance upon technical vacuities and protests that removal of the cards would unduly disrupt the routine of its record keeping, that some measure of persuasiveness informs its plea. The cards which it alleges, and the Court finds, "are put through a 'National Cash Register Machine' and return[**] a receipt simultaneously, are need[ed] by the respondent to continue to conduct its business on a day to day basis, * * * " The inconvenience, however, which respondent may suffer from having its cards in one place and its registering machine in another must yield to the public interest.[6] If, moreover, malfeasance were found to exist, the manifest benefit to be derived from disclosure to the membership would justify any inconvenience caused to the defaulters whose misconduct is disclosed. The Court is not unduly optimistic when it anticipates that the extraordinary skills which devised the mechanism the respondent now utilizes for its record keeping may likewise contrive some temporary, although possibly less efficient, expedient in substitution. Candles are still lit in households when a fuse blows. As the Court's suggestion of one alternative, entries may, without excessive cost or inconvenience, be made manually for a brief period, and thereafter when the cards, having been examined and reviewed by the Secretary, shall have been returned to the local, the data may be transposed to the cards.

Yet the Secretary in implementation of the investigatory provisions of the Act, may not act oppressively.[7]

Respondent is, accordingly, directed to deliver the records to the Secretary, these to be examined by him with reasonable diligence and dispatch. If subjected to test for authenticity or other proper purpose, the cards shall not be defaced nor mutilated nor dealt with in such fashion as to interfere with their subsequent processing by the respondent's registering apparatus. The option is additionally given to the respondent to deliver all the cards, some 3,500 in number, at one time, in which event they may be retained by petitioner for not more than thirty days, or to make such delivery in two approximately equal installments, each of which the Secretary may keep for not more than twenty days. During such time as any of such records are in the Secretary's hands or subject to his control he shall make them conveniently and comfortably available to respondent or its representatives, but under the observation of the Secretary, for perusal, or reference thereto for any proper purpose, but not, while in the Secretary's custody, for the making of any further entries thereon or alteration or deletion of any matter appearing thereon at the time of their original delivery to the Secretary.

Finally, either party shall have the right to apply at the foot of the order to be entered herein for additional relevant relief, such order to be settled on notice.

how the union might sustain prejudice were the Secretary, whose interest is not that of one idly curious, to investigate and thereby confirm the integrity of the records. Is it not also the desire of respondent's officials to have it publicized that they have conserved and disbursed with a fiduciary's sensitive conscience and fidelity the funds entrusted to them by the membership? If, on the other hand, the pre-Landrum-Griffin fiduciary accounting should exhibit less than perfection in that unpoliced era, this circumstance should not be kept as light under a bushel, but resorted to for its illumination in helping to discover in the subsequent period of the Secretary's statutorily mandated supervision, violations which might otherwise escape detection.

6. F. T. C. v. Standard American, Inc., 306 F.2d 231 (3d Cir. 1962); Wirtz v. Local No. 502, International Carriers, etc., 217 F.Supp. 155 (D.N.J.1962).

7. Goldberg v. Truck Drivers Local Union No. 299, 293 F.2d 807 (6th Cir. 1961).